LESLIE E. WILKINSON *et al.*, Appellants, *vs.* MYRTLE JOHN-
SON, formerly known as Myrtle McElmeel, Appellee.

*Opinion filed November 26, 1963.*

Samuel S. Cohon, of Chicago, for appellants.

Ben Copple, of Chicago, and Osborn & Hershman, of Franklin Park, (Jack W. Osborn, of counsel,) for appellee.

Mr. Justice Hershey delivered the opinion of · the court:

Plaintiffs, Leslie E. Wilkinson and Emily J. Wilkinson, brought suit in the superior court of Cook County to declare that two absolute deeds to certain real estate were in fact intended as mortgages and were given to secure an indebtedness that had since been fully repaid, which suit sought a recoveyance of the property. Defendant had previously brought suit against plaintiffs in forcible entry and detainer and for certain back rent, which suit was consolidated with plaintiffs' case. The cause was· referred to a master in chancery, and the court, upon the master's recommendation, entered a decree dismissing plaintiffs' complaint and finding that the plaintiff Leslie Wilkinson was unlawfully withholding possession of the premises and was indebted to defend-

ant for $4,051. A freehold being involved, this court has jurisdiction. *Robnett* v. *Miller,* 303 Ill. 515.

Prior to June 22, 1950, Leslie E. Wilkinson, a building contractor, owned the property in question, which consisted of two small factory buildings and an office building. At that time Wilkinson was involved in an improvement program and was heavily indebted to the Franklin Park Lumber & Fuel Co. (hereinafter referred to as Franklin) and also owed lesser sums to that company's president, Louis E. McElmeel, as well as to other builders and suppliers. On June 22 Wilkinson entered into a written trust agreement with these creditors under which the property was conveyed to the American National Bank and Trust Company of Chicago as trustee for Wilkinson and the various creditors.

The trust agreement as amended provided among other things: (1) that prior to August 15, 1950, Wilkinson would have the right to direct the trustee to convey the property to a purchaser for not less than $22,000, the approximate total then owed to all creditors; (2) that after August 15, 1950, all power of sale conferred upon Wilkinson would cease, and the trustee was then authorized to sell the property for the same minimum price upon written direction of the creditors' representatives, and that any of the trust beneficiaries, including Wilkinson, could be purchasers at the sale; (3) that if the property was not sold by the trustee on or before January 1, 1951, the trustee was authorized, without direction from any party, to offer the property for sale at public auction to the highest bidder for cash; (4) that the proceeds of sale were to be first distributed among the various creditors, with the balance if any to be paid to Wilkinson; and (5) that the conveyance from Wilkinson to the trustee was intended to be an outright conveyance for the purpose of liquidating the property.

Wilkinson did not direct that the trustee convey to any buyer by August 15, 1950, and on November 21, 1950, the trustee was directed by the creditors to convey the property

to the defendant, Myrtle McElmeel, the wife of Louis Mc-Elmeel, at a sales price equal to the amount necessary to pay the creditors and to credit the purchaser with the amounts owing to Franklin and Louis McElmeel. On November 25, 1950, this direction was approved in writing by the plaintiffs as residuary beneficiaries. Between November 28, 1950, and December 29, 1950, the plaintiff Wilkinson's total debt to Franklin, which by then had increased to $31,108.73, was paid by McElmeel and was taken off the company books. On December 11, 1950, the trustee deeded the property to Myrtle McElmeel. Wilkinson continued in possession of a portion of the premises used for his office and did not immediately pay any rent therefor. Within the first two and a half months following the execution of the deed to Mrs. McElmeel, Wilkinson completed the building program already begun at his own expense.

Plaintiff Leslie E. Wilkinson testified that prior to his execution of the approval of sale to the defendant on November 25, 1950, he had had various conversations with Louis J. McElmeel in which it was agreed that McElmeel would loan Wilkinson a total of $36,000 and that Wilkinson as security for this loan would sign the property over to McElmeel's wife. It was agreed that Wilkinson would have no written evidence to show that he was still the owner of the property. Wilkinson claimed that he was willing to enter into this type of agreement with McElmeel because of a long standing relationship with McElmeel, the exact nature of which he did not mention.

Wilkinson further testified that during these conversations it was disclosed that the rentals on the property paid by the various tenants amounted to $520 a month and it was agreed that McElmeel would keep these rentals, which were to include $75 a month to be paid by Wilkinson, and, after charging 5% annual interest, would apply the balance to the repayment of principal until same was paid.

On cross-examination, Wilkinson testified that Mc-

Elmeel loaned him $25,000 around November 25, 1950, in connection with the bills with Franklin and that McElmeel loaned him the balance about two weeks later, all in connection with same deal. He repeated that of the total of $36,000 loaned to him, $31,108.72 went to Franklin. Although the record is not altogether clear as to the purpose of the additional $5,000 either loaned or paid by McElmeel, it is noted that the total amount of all other creditors' bills paid to the trustee by McElmeel as a part of the purchase price approximated that amount.

Plaintiff Wilkinson also paid to Franklin some $4,200 in two checks after the execution of the deed of December 11, 1950. Both checks were marked "L. E. Wilkinson Special Account" and were paid by Franklin to McElmeel. Wilkinson did not, however, assert that these two payments constituted a partial repayment of the alleged loan, but claimed instead that that loan was fully repaid from the receipt by the defendant of the $520 monthly rentals.

On July 12, 1951, Wilkinson filed a mechanic's lien against the defendant, the American National Bank and Trust Co., and the Baltimore and Ohio Terminal Railroad claiming that $34,000 was due him on a contract entered into in March of 1949 with the above as owners to erect a building for $37,000. Actually Wilkinson still owned the property in 1949 and it does not appear that any agreement prior to the trust deed of June 22, 1950, was ever entered into. No suit for this sum was commenced by Wilkinson nor does the record contain any further evidence that any building was ever erected by Wilkinson for the defendant. In November of 1951, some four months after the above lien was filed, the plaintiffs executed a quitclaim deed conveying all their right, title and interest in the property to Mrs. McElmeel. They testified that this was done at Mr. McElmeel's request and as additional security for the money that he had already loaned Wilkinson.

On January 19, 1952, Wilkinson entered into a written

contract with Myrtle McElmeel and Louis J. McElmeel, her husband, as sellers, wherein he contracted to repurchase the real estate for $41,000, and an earnest money deposit of $1,000 was paid by Wilkinson. This contract called for the balance to be paid by March, 1952, which was not done and the contract was thereafter forfeited. Regarding this transaction, Wilkinson testified that, although his debt to McElmeel was only $36,000 and had through the collection of rentals been reduced, McElmeel demanded the sum of $41,000 in complete repayment of the alleged loan. Thereafter, on August 28, 1952, Wilkinson entered into a lease as lessee with the defendant as lessor of an office building located on the property for a term of five years at a rental of $85 per month. Rent was paid by Wilkinson pursuant to the terms of the lease until January 1, 1956, and the defendant's present claim against the plaintiff is based upon this lease. Wilkinson testified that Mr. McElmeel agreed that the "rent" paid would be applied in repayment of the debt.

The income tax returns of Louis and Mrytle McElmeel for the years 1951 through 1956 were introduced into evidence and in each the income from the real estate was shown by them as rent, and not as interest or the return of principal loaned, and the cost of the property upon which depreciation was taken was shown as $35,000.

The property was appraised at $54,000 by the defendant's expert appraiser as of November, 1950, and by the plaintiff's expert appraiser as of that date at $74,000. It is undisputed that the property has subsequently risen in value.

The defendant testified as an adverse witness under section 60 of the Civil Practice Act and admitted that she acquired the property as a gift from her husband and not by purchase from Wilkinson. It is, therefore, undisputed that she held title subject to any outstanding equitable interest owned by the plaintiffs as a result of their dealings with her husband. The defendant also testified that she did not know

the terms or conditions under which her husband acquired the property, excepting that her husband said Wilkinson owed Franklin money and that her husband paid off his debt. She admitted that she didn't go near the premises in the years 1951 through 1954 and had no knowledge of her own as to what was done with the maintenance prior to the death of her husband in November of 1955.

The plaintiffs do not here dispute the validity of the original trust deed to the American National Bank and Trust Co. or assert that that deed was executed by them simply as security for any amounts owing to the trustee or to the various creditors. Nor do they dispute the recital contained in that deed to the effect that no reconveyance was expected from the trustee and that the deed was given as part of an agreement to liquidate their properties. The plaintiffs do contend however that the deed executed by the trustee with their written approval conveying the property to Mrs. McElmeel and the quitclaim deed of November 11, 1951, were in fact intended as mortgages to secure a loan made by Mr. McElmeel of some $36,000. Thus the plaintiffs in effect are claiming that the property was repurchased for $22,000 by McElmeel from the trustee on their behalf, but with McElmeel's money allegedly loaned to them, along with an additional $14,000, with title being taken in McElmeel's wife's name simply as security for the total amount loaned. See, *Daven* v. *Downey,* 378 Ill. 543; *Smith* v. *Knoebel,* 82 Ill. 392, (involving a deed received by the alleged mortgagee at a judicial sale).

An equitable mortgage arises in a situation where money is loaned or credit given in reliance upon the security of property of the debtor, but pledged by him in such manner as not to be enforceable as a mortgage at law. "The earliest form of equitable mortgage is found in cases of conveyances, absolute in form, made in fact to secure a loan but unenforceable as a mortgage at law because of the absence of a defeasance clause * * *. Equity intervenes in these

cases for exactly the same reason which caused equitable relief in legal mortgage cases, *viz.*, to relieve from the forfeiture otherwise resulting if the grantee should refuse to reconvey on tender to him of the debt." (Walsh, Mortgages, pp. 34-35.) Parol evidence is admissible so far as it concludes to show any fact or circumstance of a nature to give a right of redemption and no further. The right to redeem must be paramount to and independent of the terms of the deed itself. *Kelly* v. *Lehmann,* 297 Ill. 33.

In order to substantiate that the absolute conveyances in question were in fact intended simply as security for money loaned to the plaintiffs it was incumbent upon them to produce clear, satisfactory and convincing evidence. (See, *e.g., Spies* v. *DeMayo,* 396 Ill. 255.) And if a transaction of this nature can be reasonably explained upon any theory other than as contrary to the deed itself then that theory will be adopted. *First Nat. Bank and Trust Co.* v. *Illinois Nat. Bank and Trust Co.* 19 Ill.2d 385.

The reason for such strictness is not difficult to understand. The public interest in the security of written transactions involving real estate would counsel extreme caution in opening the door to false swearings by an unscrupulous grantor who regretted his bargain and seeks to avoid it by "redeeming" the property. In addition a less stringent rule might encourage debtors, who wish to conceal their equity in the property from creditors, to put the apparently complete title in the name of the mortgagee. And, also, "there is the hard fact that, although deeds absolute intended as mortgages are frequent, the great bulk of such transactions are exactly what they purport to be, final and complete transfers. Consequently, the requirement of greater proof than is usually required in civil cases seems justified." Casner, American Law of Property, sec. 16.46.

The evidence is clear that the plaintiffs were paid no more than $36,000 by McElmeel for their interest in the property, which was stated to be worth at least $54,000 at

the time of the transfer, a ratio that would seem to indicate a loan transaction. This is regarded by some writers as the most important single factor in cases of this nature. (See, Walsh, Mortgages, p. 38.) Plaintiffs argue that this fact, and other evidence establishing that: (1) Wilkinson was indebted to Louis McElmeel who had paid or was paying Wilkinson's bill at Franklin, at the time the trustee's deed was executed; (2) the McElmeels signed a contract to resell at $41,000, a figure substantially below the admitted value of the property and thus recognized their obligation to reconvey same to plaintiff; (3) plaintiffs made $7,607 in permanent improvements after title was placed in defendant's name; (4) the plaintiffs paid water bills on the entire property for several years and the taxes for one year; (5) the plaintiffs remained in possession of a portion of the premises immediately following execution of the deed to defendant without paying any rent therefor; (6) the plaintiffs and another witness, Wilkinson's superintendant, testified as to certain admissions made by McElmeel to the effect that he simply wanted to be repaid the amount owed by Wilkinson and did not want to keep the property; and (7) the plaintiffs, after Louis McElmeel's death, obtained the vacation of a street adjacent to the property in a proceeding before the city council, show conclusively that the conveyances by the trustee and the plaintiffs to Mrs. McElmeel were in the nature of security transactions, and were not the result of a sale on the open market at the property's full fair market value, and that plaintiffs were in possession as owners.

While plaintiffs' argument would seem at first glance to be somewhat pursuasive, yet when analyzed the above factors are at best equivocal and in our opinion are not sufficient to upset the deeds in question.

Although the price paid, $36,000, was approximately two thirds of the property's value, according to defendant's appraiser, and only one half of its value according to plain-

tiffs' appraiser, it does not appear that any purchaser at or near those figures could be found, even though plaintiffs had several weeks in which to find one. Moreover, if the property was worth over $70,000 in 1950, as plaintiffs' witness testified, it seems inconceivable that plaintiff Wilkinson could not have obtained sufficient funds so as to be able to purchase the property himself in 1950 for $22,000 or to go through with the purchase from McElmeel at $41,000 in 1952. McElmeel actually paid to the plaintiff $14,000 more than the minimum purchase price called for in the trust agreement and $5,000 more than the total debt owed to Franklin. He and his wife were willing to resell two years later for an additional $5,000, even though the trustee's deed and the quitclaim deed had already been executed. This evidence in our opinion refutes plaintiffs' claim that the price paid by McElmeel was so low in reference to the true value of the property as to clearly indicate that a loan transaction must have been intended.

Although plaintiffs' action in improving the property permanently, in paying water bills, and in securing the street vacation are perhaps ordinarily more closely associated with ownership than with being a tenant, all of these actions were unilateral on Wilkinson's part and were done at a time when he knew that the title to the property was in defendant's name and that he had no written evidence of any ownership, and partly while he was paying rent to the defendant, pursuant to a written lease that recognized her ownership. Moreover, Wilkinson admitted on cross-examination that the water bills were paid by him pursuant to his agreement to pay to defendant $85 monthly for the use of the premises and that Mr. McElmeel had agreed to give him a credit against these monthly payments equal to the amount of the water bills. The payment of these bills, therefore, amounted to nothing more than partial rental payments.

Alleged admissions made by Louis McElmeel testified to by Wilkinson and by another witness, Joseph Nuzzo, his

superintendent, made from several months to several years after the conveyance to the trustee to the effect that McElmeel did not actually want the property but only desired collateral for money loaned, are not sufficient to establish that the deed was intended as a mortgage. Oral statements that are claimed to be admissions made following the execution of a written deed as to its true intent are not ordinarily given much weight in suits of this nature involving title to real estate. (*Totten* v. *Totten,* 294 Ill. 70; *Kelly* v. *Lehmann,* 297 Ill. 33.) This is particularly true where as in the present case other evidence clearly discloses that the grantee intended to treat the conveyance as absolute. The McElmeels reported the full amount of the rentals income on their Federal income tax returns and they depreciated the improvements from that income, conduct that hardly seems consistent with their being simply mortgagees. In addition the defendant as lessor entered into a lease with Wilkinson, she entered into a contract as owner to sell to Wilkinson, and she apparently paid the taxes on the property for all years but one.

It is true that under certain circumstances the fact that a grantee agrees in writing to resell the property conveyed to the previous owner has been considered significant as establishing the deed as a mortgage. "The existence of a clause for repurchase in and of itself is of some weight in favor of the mortgage construction as it implies an expectation of getting the property back on the payment provided for therein." (Walsh, Mortgages, p. 41; and see *Bane* v. *Pritchett,* 233 Ill. App. 617.) This factor does not, however, operate to change the burden of proof, and the grantor must still show affirmatively that the transaction was not what it purports to be but that it was in fact a mortgage disguised as a conditional sale. (*Casper Nat. Bank* v. *Jenner,* 268 Ill. 142; *Illinois Trust Co.* v. *Bibo,* 328 Ill. 252.) The contract to resell involved in the present case was executed some two years after the deed was executed and called for a price of

almost $10,000 more than the debt owed by plaintiff to Franklin and almost $5,000 more than the amount of the loan claimed to have been made by McElmeel. It does not, therefore, tend to support plaintiffs' claim that the trustee's deed executed two years previously was intended as security for a loan by McElmeel of the amount of Wilkinson's bill at Franklin, $31,000, or for the total claimed loan, $36,000.

Finally, the plaintiffs' evidence even as to the existence of a debt owing to McElmeel is totally unsatisfactory. Wilkinson asserted that McElmeel loaned him $36,000, $31,000 by paying his debt to Franklin and apparently $5,000 to pay other creditors. Wilkinson was allegedly to pay 5% interest on this debt until it was paid. It does not appear that such matters as the due date for repayment of the loan or the amount of principal to be paid annually were ever discussed. As we noted in *Kelly* v. *Lehmann,* 297 Ill. 33, the relationship of mortgagor and mortgagee must be reciprocal and where the alleged debt is due at the mere option of the mortgagor, a mortgage is not established. "To establish that a deed, absolute in form, is a mortgage, the evidence must disclose that it was intended as security for a valid existing indebtedness enforceable by the grantee in an action at law or by foreclosure proceedings [Citation.] Not only must there be a debt but it must be due upon a definite date or at a time that can be rendered definite." *Robison* v. *Moorefield,* 347 Ill. App. 508.

The plaintiffs' evidence here shows a situation where the defendant's husband, an experienced businessman of substantial means, entered into an oral agreement to loan Wilkinson, whom he knew only, as far as the record discloses, through business connections, $36,000, $5,000 of which was in connection with debts owed to third parties, at 5% interest, without having the defendant execute any note or other written instrument evidencing this debt and without agreeing upon a repayment date, except when the net monthly rentals would discharge the debt. No provision

whatever was made with reference to Wilkinson's liability to pay the debt in the event of vacancies or in the event the event the net rentals received proved to be inadequate to repay the alleged loan. Under plaintiffs' theory it appeared from the defendant's Federal income tax returns that she and her husband were paying tax on not only the interest being collected but also upon the return of their principal. Plaintiffs have cited no cases, nor have we been able to find any, where a court has declared an absolute deed to be a mortgage where the evidence as to the existence of a debt was so improbable and contrary to normal business practice. Nor did they offer any evidence as to why defendant's husband would have been willing to enter into such an agreement with them. The cases where deeds have actually been set aside almost invariably involve situations where there is a pre-existing debt and the grantee has retained a promissory note or other evidence of the debt, (see, *e.g., Brown* v. *Gaffney,* 28 Ill. 149) or where there was an agreement to reconvey entered into at the same time that the conveyance was made, (see, *e.g., Illinois Trust Co.* v. *Bibo,* 328 Ill. 252) or where the price paid was so far below the fair value of the property that under the circumstances a security transaction was clear. See, *e.g., McDonnell* v. *Holden,* 352 Ill. 362.

In this case however the deed of December 11, 1950, was executed in strict compliance with the earlier trust agreement, the validity of which is not questioned. The plaintiffs executed that earlier agreement, acknowledged that no reconveyance was expected and gave their written approval of the absolute deed to Mrs. McElmeel. In consideration Wilkinson received $31,000 through the payment by Louis McElmeel of Wilkinson's debt to Franklin and in addition received $5,000 for the payment of other debts or a total of $14,000 in excess of the minimum price called for in the trust agreement. Neither this transaction, nor the quitclaim deed executed by plaintiffs in 1951 following Wilkinson's filing of a mechanic's lien, were in our opinion shown by

clear, convincing and satisfactory evidence to have been intended as mortgages or as security for any monies loaned to plaintiffs, and the decree of the superior court of Cook County must to that extent be affirmed.

Leslie Wilkinson next contends that even if the deeds to the defendant are absolute, as we have held, the court was in error in finding that he is indebted to the defendant in the sum of $13,613 (less certain credits) for back rent. The aforementioned 5-year-lease executed by Wilkinson provides that the lessee in the event of a wrongful holdover following the termination of the lease on August 31, 1957, must pay a rental in the amount of $10 per day until he has surrendered possession. The court computed the total amount owing to defendant on the basis of $85 per month from January 1, 1956, when Wilkinson ceased paying rent, to October 10, 1960, the date the master's report was approved and at $10 per day from October 10, 1960, until August 15, 1962, the date possession was surrendered.

However, the defendant's original complaint sought only $3,400, which sum was computed on the basis of $85 per month including that period after the expiration of the lease during which plaintiff Wilkinson was in possession of the premises. Further Wilkinson was ordered by the court, pursuant to an agreement with the defendant, to deposit with the clerk of the court $85 per month pending the determination of the controversy. The defendant, by these actions having elected to treat Wilkinson as a holdover tenant at $85 per month, cannot now alter that election. *Clinton Wire Cloth Co.* v. *Gardner,* 99 Ill. 151.

The defendant, therefore, is entitled to rent at the rate of only $85 per month from January 1, 1956 to August 15, 1962, which amount is $6,740. Against the total rent due the defendant, Wilkinson was found by the trial court to be entitled to credits of $1,995, the amount paid into the court pursuant to the above order, and $7,607 for permanent improvements. The defendant does not question the validity

of these credits and, when they are taken into account, it appears that the defendant owes Wilkinson the sum of $2,872.

Wilkinson also contends that he is entitled to a further credit of $4,243.23, the amount of the two payments made by him in 1950 and 1951 to Franklin, which payments were then turned over by Franklin to Louis McElmeel. These payments were actually in the form of subcontractor's checks made payable to Franklin but delivered to Wilkinson, who in turn handed them to Franklin. However, the evidence disclosed that Wilkinson, a building contractor, continued to purchase supplies from Franklin even after the transactions involving the title to the property and after he commenced paying rent to the defendant. Significantly, Wilkinson did not testify as to the purpose of these two payments or claim that they were for anything other than material purchased. Similarly Mrs. McElmeel was not asked nor did she testify as to whether or not these payments were received by her as rent. There was no evidence that any other rental payments made by Wilkinson were paid through Franklin or in any manner other than directly to Mr. or Mrs. McElmeel. Obviously, therefore, there is no evidence in the record from which it can be determined that the two payments in question were intended to be credits against the rents owed by Wilkinson.

The decree of the superior court of Cook County, insofar as it relates to plaintiffs' claim that the deeds to the defendant were intended to be mortgages, is affirmed. That part of the decree as to the amount of rents due the defendant is reversed and the cause is remanded with directions to modify same in accordance with this opinion.

*Affirmed in part
and reversed in part
and remanded, with directions.*