*In re* ESTATE OF JAMES M. RAGEN, JR., Deceased.—(ROBERT E. RAGEN, Petitioner-Appellant, *v.* VIRGINIA E. RAGEN *et al.,* Respondents-Appellees.— (THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Attorney General, Intervening Appellee).)

First District (5th Division)     No. 79-622

Opinion filed May 29, 1981.

1036

O'Brien, Carey, McNamara, Scheuneman & Campbell, Ltd., of Chicago (Peter B. Carey, John C. O'Rourke, Jr., Timothy J. McGonegle, and Stanley Zimmerman, of counsel), for appellant.

William J. Scott, Attorney General, and Spivack & Lasky, both of Chicago (Robert A. Tingler, Robert D. Ericsson, and David S. Rosen, Assistant Attorneys General, and Allen N. Lasky, Norman E. Goldman, and George L. Grumley, of counsel), for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

Petitioner, Robert E. Ragen, brought an action for the admission into probate of a will codicil allegedly executed by the decedent, James M. Ragen. The trial court denied admission of the purported codicil to probate, finding that the decedent's signature had been forged. On appeal, petitioner contends that the trial court erred (1) in allowing the testimony of handwriting experts to prevail over the uncontested testimony of the attesting witnesses; (2) in admitting the testimony of the estate's attorney over petitioner's claim of an attorney-client privilege; and (3) in admitting Virginia Ragen's discovery deposition as evidence at the hearing for the admission of the codicil to probate. We affirm the trial court's judgment.

James M. Ragen, Jr., petitioner's brother, died in a Singapore hospital in October 1973. His will, dated July 2, 1968, was admitted to probate in the Cook County Circuit Court on September 17, 1974. The will bequeathed most of his estate to a charitable trust, with smaller bequests to his brothers and sisters. Before the pending petition was filed, two other actions were brought against the estate. The first was a will contest filed by decedent's two daughters, who were disinherited under the will. They settled for $100,000 each. The purpose of the second petition was to amend heirship, filed on behalf of decedent's alleged illegitimate child, Ray-Chuen Chang. The trial court granted the petition to amend, finding that Ray-Chuen Chang was the daughter of James Ragen. On appeal, we reversed the judgment on the ground that the court had applied the wrong legal standard to the evidence, and remanded for further proceedings. *In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 398 N.E.2d 198.

The subject of the pending litigation is a purported codicil to decedent's 1968 will. The three-page document is dated September 2, 1972, but was not discovered until July 14, 1978. This codicil changes the bequests and eliminates the charitable remainder trust. Under its terms, petitioner Robert Ragen receives 40% of his brother's estate. Virginia Ragen, decedent's sister and co-executor of the original will, receives 10%. Decedent's three other sisters and two daughters also receive 10% each.

On September 18, 1978, shortly after discovering the codicil in his brother's suitcase, Robert Ragen filed a petition to admit the document to probate in the Cook County Circuit Court. In October 1978 the attorney general filed objections to the petition on the grounds that decedent's signature on the codicil was not genuine. Two months later, following pretrial discovery, respondent Ray-Chuen Chang also filed objections to admitting the codicil to probate.

The hearing began on December 14, 1978. Petitioner Robert Ragen

first called Joan Ruggerio, one of the witnesses who attested the purported codicil. She testified that she had visited Robert Ragen's houseboat in Miami Beach, Florida, on September 2, 1972. Ruggerio stated that she was a social and business friend of Robert Ragen and had met the decedent, James Ragen, two or three times before seeing him on the houseboat on September 2, 1972. During her visit that day, she testified, the decedent asked her to witness the codicil. He told her the document was an addition to his will. She saw him sign it and then signed her own name. Frank O'Connor, an attorney who also witnessed the document, was also present. Ruggerio further testified that she believed that James Ragen was of sound mind when he executed the document. On cross-examination she admitted that she "assumed" that the first two pages of the codicil were the same two that James Ragen had signed on September 2, 1972, but could not be certain.

The next witness, Alex Gordon, testified that he is an attorney licensed to practice in Florida. He shared office space with Frank O'Connor, since deceased, for over 30 years. He further testified that he was familiar with O'Connor's signature, having seen it on hundreds of documents. He identified O'Connor's signature on the attestation page of the three-page document. Although he did not recall ever having seen the decedent or any document relating to him, he stated that he and O'Connor had maintained separate files. Petitioner Robert Ragen, a Florida resident, then testified in his own behalf. He said he first saw the codicil on July 14, 1978, in his attorney's office in Miami Beach, where he had brought the decedent's suitcase to be inspected. He identified a copy of decedent's will, which he said was attached to the codicil when he first saw it in his brother's suitcase. He had seen the suitcase at the Singapore hospital at the time of his brother's death. Ragen testified that he did not look inside the suitcases at any time and that nuns at the hospital packed and strapped them together for shipment to Virginia Ragen's house in Chicago. They remained there until July of 1978, at which time they were sent to her Florida home. Petitioner and his attorney, Gordon Taylor, removed the suitcases from Virginia's home and took them to Taylor's law office. There, petitioner found the purported codicil in an envelope. He and Gordon Taylor brought it to Chicago and filed it.

After petitioner rested his case, respondent Ray-Chuen Chang called Robert Ragen as an adverse witness. He testified that he came to Chicago in February 1978 to testify in the heirship proceedings involving Ray-Chuen Chang. He gave Attorney Grossi some of decedent's papers, which he claimed were given to him by Jimmy So, decedent's secretary. The papers included a child's photograph and other things which he thought might be relevant to Ray-Chuen Chang's heirship action. During his stay

in Chicago he did briefly visit Virginia Ragen's home (where decedent's suitcases were stored at the time), but did not remain in her home for more than a few minutes. Regarding the execution of the codicil, petitioner testified that decedent, Joan Ruggerio, and Frank O'Connor were on his houseboat in Miami Beach on September 2, 1972, but that he was not present when the codicil was signed. He said he knew nothing about it until July 14, 1978, when he and his attorney found it in decedent's suitcase.

Attorney Grossi, one of the estate's attorneys, next testified. Petitioners objected on the basis that the attorney-client privilege barred Grossi from divulging any information that petitioner had given him during the February 1978 heirship proceedings. The trial court held that no attorney-client privilege existed and ordered Grossi to answer counsel's questions. He testified that petitioner gave him two packets of decedent's papers for possible use in the February 1978 heirship hearing. Ragen delivered the first packet on the day he arrived from Florida. Grossi believed that the second packet, delivered two days later, may have come from Virginia Ragen's home in Chicago. Included in this second packet was decedent's bill from a New York hotel, dated September 4, 1972.[1]

The next witness, William R. Dillon, was decedent's attorney for 30 years. On August 31, 1972, he had a telephone conversation with his client, who was in New York at the time. Dillon made some calls to Florida on September 1, 1972, at decedent's request. He testified that he had never heard of the Florida lawyer, Frank O'Connor, and that the decedent had never mentioned the codicil to him. Dillon further testified that decedent had asked him about the impact that the birth of the child in Taiwan would have upon his will. Dillon stated that he was familiar with James M. Ragen's signature and identified some of the exemplars. When shown the contested signatures on the codicil Dillon noted that, while it bore some similarities to his client's signature, he had doubts it was genuine because the tails of the letters "J" and "g" were not "ballooned out" as much as usual.

Robert A. Cabanne, an expert examiner of questioned documents, next testified. After examining decedent's signature on the will and 90 other exemplars of his signatures, Cabanne compared them with the two signatures on the purported codicil and concluded the latter were

---

[1] Respondents point out that a second bill from the hotel was found in decedent's suitcase on June 14, 1978. This bill was dated September 2, 1972, the day respondent purportedly executed this codicil in Florida. Reasoning that the two bills from the same weekend probably would have been in the same group of papers in decedent's suitcase, respondents suggest that petitioner in fact had access to the suitcase and removed some documents from it while he was in Chicago to testify to Ray-Chuen Chang's heirship proceedings.

forgeries. He testified in detail from his examination and from nine photographs of the signatures.

Donald Doud,[2] another expert examiner of questioned documents, testified that the signatures on the codicil had not been executed by the decedent. His conclusion was based on a comparison of the questioned signatures with the 90 exemplars and the signature on the original will. He also testified that the photographic transparencies of the name "James" on pages one and two of the codicil matched up very closely, although he could not state positively that the signatures were traced.

In addition to the testimony adduced at the hearing there were two depositions introduced into evidence. Virginia Ragen's deposition was taken in Florida after the court was advised that her health prevented her from travelling to Chicago for the trial. According to her testimony, decedent's suitcases had been shipped to Chicago from Singapore with James Ragen's body. In her home in Chicago, she had opened them but did not look through them carefully. They remained in her home in Chicago until June 1978, when they were shipped to her home in Florida. She added that Robert Ragen and his attorney, Gordon Taylor, came to her home to examine the contents of the suitcases and took them to Taylor's law offices, where they found the codicil.

The second deposition was that of James McGowan, manager of the New York hotel at which decedent had presumably stayed during the 1972 Labor Day weekend. McGowan identified decedent's September 2, 1972, hotel bill, which stated that Ragen had checked into the hotel on August 30, 1972, and planned to stay for three weeks. McGowan testified that it was the hotel's custom to post charges on the bills for each day of a person's stay. The September 2, 1972, bill indicated an accrual of $218.09. The bill reflected additional amounts for a long-distance telephone call and a restaurant charge. McGowan further identified a $200 check, dated September 2, 1972, made payable to the hotel. According to McGowan, in the normal course of business the hotel would stamp the backs of checks on the day they were presented. The September 2 check indicated that $200 had been paid toward James Ragen's bill. Another check was dated September 4, 1972. As of that date, Ragen owed a balance of $224.

At the conclusion of the hearing the trial court denied the admission of the purported codicil to probate and petitioner brought this appeal.

OPINION

Petitioner contends that the statutory formalities necessary to admit the codicil to probate were met; hence, the trial court improperly allowed

---

[2] Petitioner's attorney had retained Mr. Doud originally but he was not offered as petitioner's witness.

the experts' opinion testimony to prevail over that of the attesting witnesses. Section 6—7(a) of the Probate Act of 1915 (Ill. Rev. Stat. 1977, ch. 110½, par. 6—7)[3] sets out the prerequisites for a will's admission to probate:

"(a) When each of 2 attesting witnesses to a will testifies that (1) he was present and saw the testator or some person in his presence and by his direction sign the will in the presence of the witness or the testator acknowledged it to the witness as his act, (2) the will was attested by the witness in the presence of the testator and (3) he believed the testator to be of sound mind and memory at the time of signing or acknowledging the will, the execution of the will is sufficiently proved to admit it to probate, unless there is proof of fraud, forgery, compulsion or other improper conduct which in the opinion of the court is deemed sufficient to invalidate or destroy the will. The proponent may also introduce any other evidence competent to establish a will. If the proponent establishes the will by sufficient competent evidence, it shall be admitted to probate, unless there is proof of fraud, forgery, compulsion or other improper conduct which in the opinion of the court is deemed sufficient to invalidate or destroy the will."

If the court determines that a will or codicil fulfills these requirements it must admit the document to probate, and no other requisites may be proscribed. *In re Estate of Ketter* (1978), 63 Ill. App. 3d 796, 380 N.E.2d 385.) Consequently, a court cannot weigh the evidence further than to determine whether a *prima facie* case has been demonstrated. (*Shepherd v. Yokum* (1926), 323 Ill. 328, 154 N.E. 156.) Since the purpose of the hearing on the petition to admit the will to probate is to establish that it was executed in accordance with the statute (*Ketter*), the will's proponent need not prove that it is valid in every respect. In addition, a will contest may be initiated within six months of the admission of the will to probate. Ill. Rev. Stat. 1977, ch. 110½, par. 8—1.

In the instant case petitioner Ragen argues that because Joan Ruggerio's testimony and Alex Gordon's identification of the other attesting witness' signature on the codicil satisfies the statutory requirements, the court erred in denying his petition. We disagree.

■■ The explicit language in section 6—7 of the Probate Act provides that despite a showing that the formal requisites of the will have been satisfied, its validity may be negated by "proof of fraud, forgery, compulsion, or other improper conduct * * *." In effect, proof of forgery nullifies one of the elements of the *prima facie* case—the testator's signature. Thus, to the extent petitioner argues that the court erred in

---

[3] The current version of this section is found at Ill. Rev. Stat. 1979, ch. 110½, par. 6—4.

considering all the evidence bearing upon the forgery issue, he misapprehends the law. The ultimate issue for us to resolve is whether the trial court's order is against the manifest weight of the evidence. In his effort to persuade us that it is, petitioner first argues that the respondents and the court engrafted "new," additional requirements onto the statute. Second, petitioner maintains that as a matter of law the experts' opinion testimony is insufficient to overcome that of the attesting witnesses. We reject both contentions.

■■ Petitioner first disputes respondents' arguments that the codicil must fail because, among other things, it lacks "continuity"; the attestation clause on page three of the purported codicil stands independently of pages one and two; and the attesting witnesses could not positively identify the first two pages of the codicil. We agree with petitioner that the statute does not require that an attesting witness be familiar with the contents or form of a will. Nor does it require that an attestation clause be "connected" to the others by the drafting device of beginning a sentence at the bottom of one page and concluding it at the top of the next page, indicating coherence of the whole instrument. We do not believe, however, that respondents or the court intended to engraft such requirements onto the statute. The cases petitioner relies on, which discuss the *prima facie* elements of a probate action, do not conflict with the reasoning of the trial court in this case. It is true that courts may indulge in every reasonable presumption in favor of the validity of a will, to facilitate its admission to probate, and in this context an attesting witness is not required to have personal knowledge of the contents or form of the will. (*Conway v. Conway* (1958), 14 Ill. 2d 461, 153 N.E.2d 11. See also *In re Estate of Haines* (1977), 51 Ill. App. 3d 163, 366 N.E.2d 548.) Likewise, although a will's "phraseology and continuity of thought" strengthens the inference that all pages belong together and were not removed or exchanged (*In re Estate of Wolfner* (1963), 27 Ill. 2d 221, 188 N.E.2d 712), we cannot proclaim that a negative inference should be drawn from the mere fact that the attestation portion of a will is on a separate page. Nevertheless, when circumstances exist which indicate forgery or fraud, as in the present case, the trial court is undoubtedly free to consider all factors which bear on the validity of the purported codicil. We believe, therefore, that the independent attestation page and the surviving attesting witness' inability to positively identify the first two pages, while certainly not controlling on the forgery issue, may be properly considered along with all the other circumstances and do not represent an attempt to expand the statutory requirements of testamentary execution.

Respondents enumerate other facts which may be of limited significance, standing alone, yet which combine to undercut petitioner's posi-

tion. For example, respondents state that the typewriter ink on the attestation page is lighter than on the first two pages, which indicates to them that the attestation page was not typed at the same time as the other two pages. Further, they note that there is no date on the attestation page itself, and decedent's signature or initials do not appear thereon.

Aside from these considerations involving the physical format and appearance of the codicil, respondents cite the following circumstances to further strengthen their argument that the codicil is not genuine. Although the codicil radically altered the disposition of decedent's estate in favor of petitioner, decedent apparently did not tell anyone of the change, including his long-time attorney, Dillon. Even while seriously ill in the hospital, decedent never told his brother, who visited him daily, that he would inherit 40% of the estate. Moreover, Joan Ruggerio, Robert Ragen's social and business friend, who purportedly witnessed the codicil on his houseboat, never mentioned this occurrence to petitioner. Further, petitioner did not find the purported codicil until six years after his brother's death, supposedly because no one had previously searched the suitcases or knew of their contents. Finally, respondents contend that decedent's hotel bills and checks indicate that he stayed in New York during the Labor Day weekend in 1972 and therefore could not have been in Florida on his brother's houseboat executing the codicil.

After reviewing all of the above circumstances, we conclude that they support the trial court's finding of forgery. As petitioner points out, each separate circumstance may have an explanation which is not inconsistent with petitioner's position. Thus, the circumstantial evidence that decedent was in New York on September 2, 1972, does not necessarily eliminate the possibility that he flew to Florida for part of the day. Moreover, decedent's failure to mention the codicil to his long-time attorney or his brother is not inconceivable, as decedent could have had personal reasons for secrecy. We cannot reweigh the evidence, however, to determine whose version is more plausible; this task was for the factfinder, who necessarily evaluated the witnesses' credibility. We do believe, however, that the cumulative impact of all the circumstances fully supports the trial court's finding, especially when viewed in conjunction with the expert's conclusions that James Ragen's signatures on the codicil were forged.

Regarding the handwriting experts' testimony, petitioner urges us to hold that the trial court committed an error of law in allowing this opinion evidence to overcome that of the attesting witnesses. He cites *Jones v. Jones* (1950), 406 Ill. 448, 94 N.E.2d 314, as establishing a "priority" rule of evidence that reduces the experts' opinion testimony to a secondary status, which is outweighed by attesting witnesses' direct and positive statements that a will was duly executed. In *Jones*, two handwriting

experts testified as to the variations they found between the testatrix' signature on the will and other samples of her writing, concluding that her signature was forged. The two attesting witnesses, however, stated that they saw the testatrix sign the will and acknowledge it as her last will in their presence. A bank cashier from the testatrix' bank also testified that he believed the contested signature to be genuine. Other evidence established that the testatrix was more than 80 years old, had suffered a heart attack shortly before executing the will, and had written on a small table while in bed, writing without her glasses. The expert witnesses admitted that these factors could have influenced her signature. In affirming the trial court's order admitting the will to probate the supreme court noted that opinion testimony is useful "when it can be corroborated by definite facts, or when it is connected with facts which may be substantiated, but it cannot be allowed to prevail over the uncontradicted and unimpeached testimony of two disinterested witnesses * * *."

In contrast to the *Jones* situation, in the pending case the experts' testimony did not stand alone. Petitioner incorrectly assumes that Joan Ruggerio's testimony and the identification of the deceased attesting witness' signature is conclusive proof that the codicil met the prerequisites for admission to probate. As our supreme court has recognized, "The [attesting] witness may be contradicted by circumstances as well as by statements of others contrary to his own, or there may be such a degree of improbability in his statements to deprive them of credit * * *." (*Oliver v. Oliver* (1930), 340 Ill. 445, 460, 172 N.E. 917, 923.) In affirming the jury's finding that the will was not genuine, the *Oliver* court mentioned the independent circumstances of forgery that buttressed the expert testimony. These circumstances included the fact that the will had unaccountably disappeared; that the will named the drafting attorney as the recipient of the property given to anyone who chose to contest the will, and the evidence that the document had been typed on a machine which was not in existence on the date the document was executed.

■■ More recently, the supreme court reiterated the principle that expert testimony is competent evidence which, when augmented by other circumstances, can overcome the testimony of attesting witnesses. (*McClallen v. Village of Morton* (1961), 21 Ill. 2d 374, 172 N.E.2d 763.) In *McClallen* a will was denied admission to probate for reasons which included the strange manner in which the will was discovered (in the proponent's mailbox four years after the testator's death) and the fact that the proponent's main witnesses were related to him.

■■ The above authorities bar petitioner's contention that expert opinion testimony, as a matter of law, is unprobative or incapable of overcoming the attesting witnesses' statements. We have discussed the "other circum-

stances" of this case, which augment the experts' conclusions, and hold that the evidence is sufficient to defeat the admission of the purported codicil to James Ragen's will.

Petitioner next claims that the trial court erred in allowing the estate's attorney, Francis Grossi, to testify despite petitioner's assertion of an attorney-client privilege. During the hearing on Ray-Chuen Chang's petition to amend heirship, in February of 1978, Grossi's law firm filed an appearance and pleadings on behalf of the executors and legatees of the estate. Robert Ragen, one of the legatees, brought Grossi certain papers belonging to his brother and testified at that proceeding. During this time he discussed these documents with Grossi and how they arrived in his possession. Subsequently, at the December 1978 hearing for the admission of the codicil, petitioner unsuccessfully attempted to preclude Grossi from testifying as to any information Ragen had communicated to him in connection with the heirship proceeding. In addition to violating the attorney-client privilege, petitioner contends that Grossi violated the ABA code of professional responsibility by representing the conflicting interests of petitioner and the estate.

We find no basis in the record for either of these contentions. The trial court found, and we agree, that Attorney Grossi is the attorney for decedent's estate, not Robert Ragen individually. During Ray-Chuen Chang's heirship hearing, Grossi's law firm nominally represented petitioner along with the other legatees, at the co-executors' request; however, Robert Ragen did not hire Grossi to represent him. His involvement in Ray-Chuen Chang's heirship action was limited to his role as a witness called by the estate. More important, petitioner fails to persuade us that any of the information or documents he delivered to Grossi for use in the heirship action could be deemed confidential. Without the confidentiality component the privilege will not attach. (*Monier v. Chamberlain* (1966), 66 Ill. App. 2d 472, 213 N.E.2d 425.) Grossi's testimony indicated that prior to the February 1978 hearing petitioner had given him two packets of decedent's documents, one of which Grossi believed came from Virginia Ragen's house in Chicago (where the suitcases were located at the time). Petitioner had testified that he could not remember whether he gave Grossi the papers before or after the heirship proceeding. He further stated that although he did visit Virginia Ragen's home while in Chicago, he did not remove any documents from her home.

■■ Apparently, petitioner's assertion of the attorney-client privilege arises from his concern that Grossi's testimony could be construed as impeaching his own. Be that as it may, we do not believe petitioner has established the necessary elements for application of the privilege. (See, *e.g., Monier*; *Krupp v. Chicago Transit Authority* (1956), 8 Ill. 2d 37, 132

N.E.2d 532.) The issue was raised before the court several times and the court held, correctly we believe, that the facts of this case do not support petitioner's attempt to prevent Grossi from testifying.

■■ Similarly, we disagree with petitioner's contention that Grossi violated certain provisions of the code of professional responsibility. The trial court ordered him to testify as an officer of the court and as the estate's attorney having information pertinent to the pending case. We conclude that the court did not err in its ruling.

As a final point of error, petitioner argues that Virginia Ragen's deposition was noticed as a discovery deposition but the court nevertheless considered it as evidence. Citing Supreme Court Rules 202 and 206 (Ill. Rev. Stat. 1977, ch. 110A, pars. 202, 206), which provide that notices of depositions shall state whether they are to be used in discovery or as evidence, petitioner argues that it is unfair to allow respondents to classify the deposition as evidence. Because he believed it to be for discovery only, petitioner argues, he did not travel to Florida to attend the deposition.

This argument merits little discussion. We find from the record that after Virginia Ragen had failed to appear for the taking of her discovery deposition, respondents moved the court for an order compelling her deposition. The parties and the court were aware that she would not travel from Florida to Chicago for the trial because of health reasons. The trial judge informed the parties that he would consider the deposition's use at the trial and that petitioner could make any objections at that time.

The transcript of Virginia Ragen's deposition reveals that respondents' attorney stated at the beginning that the deposition was intended to be evidentiary. Gordon Taylor, who is petitioner's attorney in Florida,[4] was present on behalf of Virginia Ragen. The scope of questioning was limited by the parties' stipulation. Having read through the transcript, moreover, we fail to see how admitting the deposition into evidence prejudices petitioner in any way. Virginia Ragen did not contradict his testimony, but merely corroborated his account as to the whereabouts of decedent's suitcases following his death. She also explained that, although she admittedly opened the suitcases while they were in her possession, she never searched through them because she was too upset over her brother's death.

■■ Because we find that petitioner had actual notice that Virginia Ragen's deposition could be admitted as evidence and because we further find that its use as such did not harm petitioner, we hold that the court did not circumvent the supreme court discovery rules.

For the foregoing reasons we conclude that the evidence supports the trial court's denial of the codicil to probate. We further hold that the court

---

[4] Taylor is not representing Robert Ragen in the pending litigation.

did not err in its rulings regarding the attorney-client privilege or admission of Virginia Ragen's deposition as evidence. Accordingly, we affirm the trial court.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.